Filed 7/28/16  P. v. Ladelle CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BOBBY CHARLES LADELLE,<br><br>    Defendant and Appellant. | D069929<br><br><br>(Super. Ct. No. FSB1104036) |

APPEAL from a judgment of the Superior Court of San Bernardino, William Jefferson Powell IV, Judge.  Affirmed.

Arthur B. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Kristen Hernandez, Deputy Attorneys General, for Plaintiff and Respondent.

In June 2013, a jury convicted Bobby Charles Ladelle of first degree murder (Pen. Code, § 187, subd. (a)).  The court sentenced Ladelle to 25 years to life in prison.

The crime in this case was committed on Mother's Day 2003. The case, which was investigated by the San Bernardino Sheriff's Office, was considered a "cold case" by late 2003. It was looked at again by the sheriff's office in 2007, but it remained a cold case until events in 2011 lead to the charging and arrest of Ladelle in 2011. Ladelle does not raise a due process challenge to the precharging delay, nor does he challenge the admissibility or sufficiency of the evidence to support his conviction. Instead, Ladelle contends the trial court committed prejudicial error by instructing the jury not to consider why the district attorney did not file charges before 2011, and in failing to grant a mistrial when a prosecution witness mentioned that Ladelle had been in prison.

Regarding the jury instruction, we will find no error and no conceivable prejudice to Ladelle in giving the challenged instruction. With regard to the denial of the defense motion for mistrial, we will find the trial court acted well within its discretion in admonishing the jury and denying the motion for mistrial.

STATEMENT OF FACTS

Since Ladelle does not challenge the admissibility or sufficiency of the evidence supporting his conviction we will include a brief summary of the facts to provide context for the discussion which follows.

Amada Lopez and her husband Ernesto Cervantes owned a barbershop and salon ("the shop") located in Muscoy, an unincorporated area of San Bernardino County. In the early morning of Mother's Day 2003, the couple set up a gift stand on the corner of State Street and Highland Avenue to sell flowers and gift baskets. Several family members helped set up and sell gifts that day, including Amada's sister, Maria Lopez, and children

2

William Valenzuela, David Gomez, and Amadita Gomez.  The family began selling gifts at approximately 6:00 a.m. that day and stopped when it was dark outside, sometime between 7:00 p.m. and 8:00 p.m.

During that day, Maria noticed a suspicious vehicle pull up to the curb on three different occasions.  Each time, the passengers, two African-American males, asked for the price of several items.  The car and its occupants then left without purchasing anything.  Maria described the vehicle as a white Ford Thunderbird, and the third time the vehicle pulled up next to the gift display, Maria wrote down its license plate number.

At the end of the day, the family removed the merchandise from the corner and placed some items in the shop and loaded other items into a truck.

At approximately 9:30 p.m., Amada and William were inside the shop putting away merchandise while the other family members gathered items outside.  A male later identified by Amada as Ladelle opened the door to the shop, peeked inside, said, "Oh, you sold everything," and scanned the entire room.  Ladelle did not purchase anything, and he appeared to be "casing" the store.  Approximately 10 to 15 minutes later, two to three African-American males ("the males") walked towards the shop from a nearby field.  One of the males wore a ski-type mask and held a shotgun at his side; a second male wore a clown-like wig.  Three juveniles who were standing across the street from the shop observed the males walking from a white Chevrolet Caprice that had parked on the south edge of Adams Street, just east of State Street and adjacent to a field near the shop.  Amada noticed the males approaching and told William they were about to "get

3

robbed" and to lock the door. The males walked up the ramp that led to the shop's entrance and entered the shop.

At that point, Ernesto and David were standing outside of the shop. David faced the street, while Ernesto faced the shop. David noticed Ernesto's eyes widen and Ernesto said, "David, your mom." Ernesto "jolted" and started running towards the shop; David ran behind him. Ernesto and David armed themselves with long fluorescent light bulbs that were leaning on a wall outside of the shop entrance.

Inside the shop, one of the males pointed a shotgun at William and demanded money. The second male approached Amada, who was near the back of the shop, and searched her. Then, Ernesto entered the shop, screamed at the males, and hit the man who was wielding the weapon with the light bulb. In response, the man immediately turned around and shot Ernesto in the head. Ernesto fell to the floor and William screamed, "Mom, mom, they killed my dad." The males ran from the store and in the direction of the nearby field. The three juveniles who were across the street from the shop observed the Chevrolet Caprice leave the field area at a high rate of speed with its headlights turned off.

In 2003, law enforcement traced the license plate of the white Ford Thunderbird recorded by Maria Lopez to Keitha Brooks, who lived on Flores Street in the Delman Heights area of San Bernardino. Brooks told law enforcement that her car was with her all day at a park on Mother's Day 2003. She said her younger brother drove her son Damarcus Brooks to the park in his car, which she believed to be a white Chevrolet Caprice.

4

The day after the murder, law enforcement showed Amada a photographic lineup and she identified Ladelle as the person who first peeked inside the shop before the robbery attempt. Ladelle then became the focus of the police investigation. Police conducted surveillance on a white Chevrolet Caprice with Oregon license plates. On May 13, 2003, police followed the vehicle, which was being driven by Akia Jackson, in Delman Heights. Jackson pulled into a driveway on Flores Street and was ultimately detained and arrested. Law enforcement observed foxtails and "pieces of grass and shrub" on the floorboards of the passenger side seats of the Caprice, consistent with the vegetation in the field near the shop where the Caprice had been parked on Adams Street on the night of the murder.

Police interviewed Jackson that same day. Jackson admitted that Ladelle was the father of her children. She denied knowing about the murder but said her mother called her the day after the murder and asked what she was doing, if anyone used her car on Mother's Day, and if her car was possibly used in a murder.

On May 15, 2003, Ladelle was arrested and questioned. He said he knew law enforcement was looking for him, but denied being involved in the murder. When asked about an individual named "Romero,"[1] Ladelle said that he knew Romero and that he had a car that looked similar to Jackson's Caprice.

In July 2003, Jackson was re-interviewed by law enforcement in Oregon. Jackson said that in May 2003, Ladelle's mother instructed her to drive Ladelle to California and

---

[1] The parties stipulated that Damarcus Brooks died in 2003 and Romero Aguilar died in 2012, but their deaths were not connected with the underlying crime in this case.

Jackson complied. Ladelle told Jackson he was going to California to "hustle," i.e., to make money. Ladelle and Jackson discussed what they were going to do about money once they arrived in California. When they arrived in California, Ladelle dropped Jackson off at a motel and left with the car. At some point after the murder, Jackson received a telephone call from her mother telling her that Jackson's and Ladelle's photographs were on the news as people wanted in connection with a homicide.

In 2007, Jackson contacted the San Bernardino County Sheriff's Department regarding appellant. Jackson was interviewed and told deputies that Ladelle was responsible for the 2003 homicide and that she lied to police during her 2003 interviews. She said the couple traveled together from Oregon to San Bernardino in Jackson's Chevrolet Caprice and stayed in motels and eventually at Ladelle's aunt's house. Jackson said that on the morning of Mother's Day 2003, Ladelle left his aunt's house with the Chevrolet Caprice. Sometime later, he returned to his aunt's house with the Caprice, told Jackson to wash the vehicle, and said he had just murdered someone and not to drive the vehicle around. When Jackson asked Ladelle what was going on, appellant told her not to worry about it, "It was just some Mexicans." Prior to being arrested, Jackson said she was driving around Delman Heights with her children looking for Ladelle until she realized she was being followed. She called Ladelle and he told her she was being followed by police and instructed her to drive by his location, which was on Flores Street. She complied and pulled into the driveway at the location. Damarcus walked up to her vehicle and told her, "Don't worry about it, you didn't do anything." At the same time, Ladelle walked up to the passenger side of her vehicle and retrieved his son, then left and

6

watched Jackson from across the street as she was being arrested. Jackson said she never saw Ladelle after that.

In 2011, police interviewed Jackson again. Jackson said she, Ladelle, and their children drove her Chevrolet Caprice from Oregon to San Bernardino in May 2003. Jackson said Ladelle told her about his involvement in the 2003 murder. He said that it was a Mexican family, it was supposed to be "over some money," and that the family was selling flowers on the corner for Mother's Day and the robbery went bad. Ladelle told Jackson not to worry because there were "other cars that look like [theirs]." He instructed Jackson not to drive the Caprice, and Jackson helped wash the vehicle. Jackson said that on the day she was arrested on Flores Street, Ladelle watched her from across the street and placed his finger over his lips, which was a sign to remain quiet.

Defense

Heather Radeleff, a crime scene specialist with the San Bernardino County Sheriff's Department, was involved in investigating the murder. During her investigations, she found and documented shotgun shells, tire impressions, shoe prints, and fingerprints in dirt, gravel, and grass near the shop. She also collected evidence and conducted investigations at the Flores Street address, which included taking photographs of Damarcus's shoes and the white Thunderbird. Additionally, she took photographs of Ladelle and his shoes. Radeleff also processed Romero's Caprice and Jackson's Caprice. She "rolled" the rear tires of Jackson's Caprice, but did not conduct a tire impression analysis in this case.

7

Radeleff testified that hundreds or thousands of footprints were found in the field near the shop on May 12, 2003, but only 10 shoe impressions were placarded. She also testified that it is difficult to obtain a full shoe impression if someone is running in the area where there is vegetation.

Robert Ristow, a criminalist with the San Bernardino County Sheriff's crime lab, examined two pairs of shoes, one belonging to Ladelle and the other belonging to Damarcus, during the investigation in this case. Those shoes did not match the imprints of the 11 shoe print photographs provided to Ristow.

Kesha Young, Ladelle's cousin, testified that on Mother's Day 2003, she and Ladelle were together all day at their aunt's house.

DISCUSSION

I

*THE JURY INSTRUCTION*

During the instructions conference, the prosecution offered and the court agreed to give the following jury instruction:

> "The reason why the District Attorney's Office did not file criminal charges against the defendant until 2011 should not enter into your deliberations and should not be considered by you in any way."

Defense counsel did not object to the instruction, but did voice concern about whether she could continue to make her basic argument to the jury. That argument was that the case was a "cold case" in 2003, a cold case in 2007 and remained a cold case in 2011, meaning it was too weak to support conviction. The court assured counsel she

8

could indeed make such argument. Thereafter counsel raised no objection to the instruction.

In addition, counsel has not brought to our attention, and our review has not discovered any evidence presented to the jury about the prosecution's charging process or decisionmaking. As best we can determine from the record it was always the sheriff that conducted the investigation and it was the sheriff's cold case unit that continued to work on the case until charges were brought in 2011.

## A. Standard of Review

We review claims of instructional error under the de novo or independent standard of review. We independently determine if the instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Where the instruction is challenged as erroneous, we seek to determine whether there is a reasonable likelihood the jury would have applied the instruction in a manner which would be prejudicial to the defendant. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) We assume, in making such assessment that the jurors are intelligent and that they will consider the instructions given as a whole. (*Ibid.*; *People v. Davis* (2005) 36 Cal.4th 510, 545.)

## B. Forfeiture

Ladelle claims the instruction violated his federal Fifth, Sixth and Fourteenth Amendment rights. He acknowledges there was no objection, but claims objection is not required under section 1259 where the instruction affects his rights. As we will discuss, we are satisfied the instruction did not impact any of Ladelle's constitutional rights, as the jury was fully instructed in the law, credibility of witnesses and the burden of proof.

9

We believe Ladelle has forfeited any constitutional challenge to the instruction by failing to object in the trial court. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) However, we will discuss the merits of Ladelle's contention out of an abundance of caution.

## C. Analysis

As we have observed, neither party has identified any evidence in this record from which the jury could make any judgment about the prosecutor's charging decision. Further, the jury was fully and properly instructed on the burden of proof and credibility of witnesses, and nothing in the special instructions even hints at either of those topics.

At the outset of the instructions, the trial court advised the jury, in part, as is done in all criminal cases: "The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial."

Ladelle argues, however, that the delays in bringing the case are due to its weakness. Thus, as we understand the argument, telling the jury not to speculate about why the district attorney did not charge Ladelle before 2011, somehow lightens the prosecution's burden of proof and undermines his assaults on the credibility of prosecution witnesses.

The jury was well aware of the difficulties the sheriff had in investigating the case, which difficulties were well argued by defense counsel. However, we repeat there is nothing in this record from which the jury could have drawn any inferences about the charging decision by the district attorney. Indeed, to invite such speculation runs

10

contrary to the admonition that charging is not evidence. If it is not evidence, we are at a loss to understand how Ladelle was harmed by telling the jury not to consider actions by the prosecutor, about which there was no evidence, dispute, or rational connection with the factfinding task given to the jury. Ladelle was not harmed by this benign jury instruction. There was no error.

## II

### *THE MOTION FOR MISTRIAL*

Prior to trial the court ruled that the fact Ladelle had been in prison was not admissible. Witness Jackson was advised by the court not to mention the fact Ladelle had been in prison.

During cross-examination of Jackson, the following occurred:

> "Defense counsel: Do you recall talking to the officer in 2011 about talking to [appellant]?
>
> "Jackson: And I said yes.
>
> "Defense counsel: Okay. When was it that you talked to Bobby?
>
> "Jackson: It was after he got released from prison. I don't know the exact day.
>
> "Defense counsel: Okay. Now, you are saying he got released from prison. You are talking about 2011?
>
> "Jackson: You said that I talked to Detective Myler in 2011 about the homicide that happened in 2003. And you asked me when did I talk to him about that. I talked to him about it after he got released from prison.
>
> "Defense counsel: And he got released from prison in 2010?
>
> "Jackson: '10."

11

After the noon break, defense counsel moved for a mistrial. Counsel argued the comment about Ladelle being in prison irreparably prejudiced the jury and that mistrial was necessary. The court disagreed. The court found the statement was not a willful violation of the court's order, that the court was going to admonish the jury and found the statement would not cause prejudice to Ladelle in light of the admonition. Thereafter the court told the jury:

> "One of the things that was mentioned just before lunch, there was a reference about a timeline when some questioning between the witness and the defendant took place and the witness said I think it was after he got out of prison or something like that.
>
> "The jury is ordered not to consider that prison stint for any purpose. Don't use it in your deliberations in any way. It has nothing to do with this case. It is not evidence in this case.
>
> "The witness appeared to be using that as a mental tag line to put that conversation on a timeline, which is appropriate. But that instance, that other criminal conduct and the prison stint has nothing to do with this case."

## A. Legal Principles

A court should grant a mistrial where something has happened that will irreparably prevent the defendant from receiving a fair trial. Such mistrial should be granted in those cases where the error cannot be cured by timely admonition or instruction. (*People v. Avila* (2006) 38 Cal.4th 491, 573.) The determination of whether it is necessary to grant a mistrial is committed to the sound discretion of the trial court. (*People v. Collins* (2010) 49 Cal.4th 175, 198 (*Collins*).)

12

We review a decision to grant or deny a motion for mistrial under the abuse of discretion standard. We will only overturn such decision where the record demonstrates a clear abuse of that discretion. (*People v. Maury* (2003) 30 Cal.4th 342, 434; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

In *Collins, supra*, 49 Cal.4th at pages 196 to 199, the court upheld the denial of a motion for mistrial in circumstances similar to those in the present case. There a witness testified about an event which occurred "before he [the defendant] got out in December." The court found no abuse of discretion as the remark was brief and did not cause undue prejudice or result in unfairness. (*Id*. at p. 199.) The defendant in *Collins* did not request an instruction as a matter of trial strategy. Yet the court still found the trial court did not abuse its discretion.

## B. Analysis

Similar to the facts in *Collins, supra,* 49 Cal.4th 175, here the witness mentioned Ladelle's release from prison in 2010 as a reference point to answer defense counsel's question about timing. The trial court found the violation of the court order was inadvertent and promptly instructed the jurors not to consider the comment in their deliberations.

We are satisfied the brief reference to imprisonment, merely as to a date for another event was not so egregious or inflammatory that it could not be cured by proper and timely admonition. The trial court acted well within its discretion to deny Ladelle's motion for mistrial.

13

DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.